GROSS, C.J.
Although Mardala Derival was charged with one count of manslaughter and one count of aggravated child abuse, she was convicted at a jury trial of the lesser included offense of child abuse. On appeal she asserts error in the failure to redact the words of an interrogating detective from her statement to the police, which was published to the jury. We hold that the trial court did not abuse its discretion because the probative value in the officer’s words was not “substantially outweighed by the danger of unfair prejudice” or “misleading the jury.” § 90.403, Fla. Stat. (2009).
Derival and her boyfriend were tried together on charges stemming from the death of their five-month-old baby, who died in the middle of the night. The autopsy report revealed a blood alcohol level of .476 percent and a brain alcohol level of .34, both lethal levels using data designed for adults. Alcohol was also found in the baby’s formula bottle at a level of .130 percent. The medical examiner testified that there had been changes in the baby’s liver indicating she had ingested alcohol multiple times over multiple days. The state offered evidence that alcohol toxicity was the cause of death.
Witnesses testified that Derival had said she put alcohol in the baby’s bottle because the child would not stop crying. Derival and her boyfriend gave statements to police that they fed the baby alcohol mixed with water, which was an old Haitian folk remedy for sick children.
Derival’s defense was that the baby had died of causes unrelated to the fact that she had given the baby alcohol, so that there was no child abuse. When officers got to the house to investigate the death, Derival’s boyfriend told officers the baby had been sick with diarrhea, fever and vomiting for about a week. The medical examiner testified that the child had lung and ear infections and laryngitis. He did not, however, believe that the infections contributed to the death.
A defense expert testified that the baby had died from an infection of the kind of bacteria found in her lung and ear, which can cause septic shock. An expert on Haitian culture testified that in Haiti, a different kind of alcohol is used to make the alcohol-based home remedy. In the United States, they substituted white alcohol or ethanol.
During trial, the state agreed to redact a number of statements made by officers during interrogation, but disagreed as to others. On appeal, Derival argues that it was error for the trial court to allow the jury to hear the interrogating officer’s assertions of fact in the following three exchanges:
Q. Mardala, do you understand that the baby died because of the having too much alcohol?
A. It wasn’t us that put (inaudible). It wasn’t us that put the alcohol in the baby’s food. I know the alcohol was— did the baby good.
Q. Who could have done that?
A. I don’t know. No one else comes in the house, (inaudible) we’re the only two with the baby.
Q. Mardala, there was a lot of alcohol in the baby.
A. The only thing that we put was a little bit of alcohol in the water. It was just a little bit. That was it. That’s all. We don’t know anything about that because we didn’t put any alcohol on the food — on the food. I didn’t (inaudible) anything. The only thing we did was the little mixture of the medicine, but we *359 didn’t put the food — -we didn’t put any alcohol on the food. We didn’t do. It I don’t know who did.
II
Q. Would you normally make the baby’s formula right before you feed the baby at night?
A. Yes, yes.
Q. You don’t know how the alcohol got into the formula?
A. No.
Q. Is it possible that you put the alcohol in the formula by mistake?
A. No.
Q. Do you know what the alcohol is? Was that for Mackenson to drink?
A. Yes. It’s white alcohol.
Q. And no one gave that baby alcohol before?
A. No.
Q. Okay. Do you understand that it is a fact that is true that somebody has been feeding baby alcohol?
* * *
A. No.
Q. It is true.
A. How is it true what I said?
Q. No, it’s true that the baby had alcohol in its system, a lot of alcohol.
A. I didn’t say that you’re lying, but we just didn’t give the baby any alcohol.
Q. I just want to make sure that you understand that, that is true.
A. But we didn’t do it. We didn’t do that.
Q. And you know nobody who did?
A. No....
III
Q. The reason the baby was lost was because of the alcohol.
A. It was just a little medicine that we gave the baby. Nothing else.
Q. Not true. More alcohol was given.
Derival relies on Sparkman v. State, 902 So.2d 253 (Fla. 4th DCA 2005), to argue that the trial court erred when it failed to redact from her statement the officer’s descriptions of the cause of the baby’s death. However, the officer’s assertions regarding the baby’s cause of death did not carry the danger of unfair prejudice that informed the decision of the court in Sparkman.
As we explained in Eugene v. State, 53 So.3d 1104 (Fla. 4th DCA 2011),
Sparkman was a manslaughter case involving the death of a toddler. Id. at 254. Other than the defendant, there were no direct witnesses to the events leading up to the child’s death. See id. at 254-57. The case was based largely upon after-the-fact testimony from the child’s father, an emergency medical technician, and two medical examiners, one of whom testified that traumatic, and not accidental injury was the cause of the child’s death. Id. In a tape recorded statement with a detective, the defendant maintained that she did not do anything that would have hurt the baby, that she just shook her a little to get her to wake up from a seizure. Id. at 256-57. During the statement, the detective launched into an extensive recitation of his theory of the case, outlining his version of the facts of the crime. Id. at 257-58. The defendant responded to the detective’s accusations with “Uh huh” and with silence.-
The Sparkman court reversed because, when combined with the defendant’s equivocal responses to them, the failure to exclude from the tape recording the detective’s hypotheses about how the crime occurred created a substantial danger of *360 unfair prejudice. As we explained in Eugene,
[t]he basis of the holding [in Sparkman ] was that the probative value of the detective’s words was “substantially outweighed by the danger of unfair prejudice” or “misleading the jury” under section 90.403, Florida Statutes (2005). See Shrader v. State, 962 So.2d 369, 371 (Fla. 4th DCA 2007) (recognizing that basis of holding in Sparkman was that detective’s statements were “blatantly prejudicial”). The danger of unfair prejudice in Sparkman was that the jury might have taken the defendant’s responses to the detective’s detailed and speculative narrative — silence and “Uh huh” — as admissions of guilt.
Not everything a detective says to a defendant during a recorded interrogation is unfairly prejudicial under 90.403. The Supreme Court has recognized that a jury may hear an interrogating detective’s statements about a crime when they provoke a relevant response from the defendant being questioned. For example, confronting a defendant with a codefendant’s statements may properly be used “as provocation” to observe a defendant’s reactions. See Jackson v. State, 18 So.3d 1016, 1031-32 (Fla.2009). Such statements may be heard by the jury to “give context to the interview.” McWatters v. State, 36 So.3d 613 (Fla.2010). When placed in “their proper context,” an interrogating detective’s statements to a suspect could be understood by a “rational jury” to be “techniques” used by law enforcement officers to secure confessions. Id. at 637 (quoting Worden v. State, 603 So.2d 581, 583 (Fla. 2d DCA 1992)).
Id. (footnote omitted).
In this case, there was no substantial danger of unfair prejudice in allowing the jury to hear the officer’s statements about alcohol. These facts came into evidence through other witnesses in the trial who were subject to cross examination. Unlike Sparkman, Derival made no equivocal responses to the officer’s questions that the jury might have misconstrued.

Affirmed.

STEVENSON and GERBER, JJ., concur.