763 So.2d 1146 (2000)
Melvin WALKER, Terrance Tignor, Fred Tignor, and Leila Stephens, Appellants,
v.
CITY OF POMPANO BEACH, Appellee.
No. 99-0597.
District Court of Appeal of Florida, Fourth District.
January 19, 2000.
*1147 Steven W. Gomberg of The Law Office of Steven W. Gomberg, West Palm Beach, for appellants.
Jonathan M. Matzner, and Robert H. Schwartz of Adorno & Zeder, P.A., Fort Lauderdale, for appellee.
PER CURIAM.
Appellants were the plaintiffs in a false arrest suit filed in the circuit court. Since the facts of the case were not in dispute, both sides filed motions for summary judgment on the issue of liability. The trial court entered judgment in favor of appellee, the City of Pompano Beach.
The sole issue on appeal is whether the trial court was correct in its ruling that "there existed a founded suspicion which formed the basis to conduct the temporary stop and detention of the Plaintiffs." We hold that no founded suspicion existed to justify the stop.
Leila Stephens and Melvin Walker are sisters, ages 50 and 59 respectively. Fred Tignor, age 43, is their brother. Terrance Tignor, age 23, is Fred Tignor's son. All four appellants are African-American.
On November 19, 1996, at about 10:00 p.m., appellants were in a reddish colored Nissan Sentra automobile being driven by Mrs. Walker. They were on their way to Imperial Point Hospital in Fort Lauderdale to obtain emergency medical treatment for Fred Tignor, who had become ill earlier that day.
As they drove onto the hospital grounds, police from the City of Pompano Beach, by the use of lights and sirens, caused appellants' vehicle to stop. Each of the appellants were removed from the vehicle, by verbal commands, at gunpoint. The police ordered them to move to a specified location away from the car, where the men were ordered face down on the ground with their limbs spread and the women to their knees. They were handcuffed and frisked for weapons. They were held for a period of time before being told they could leave.
The City's position was that the stop arose from a series of three armed robberies of Chinese restaurants in Pompano Beach and Deerfield Beach. On November 19, 1996, all units of the police department were shown an intelligence bulletin which stated:
OVER THE WEEKEND THERE HAVE BEEN AT LEAST THREE ARMED ROBBERIES OF CHINESE RESTAURANTS IN OUR AREA. ALL ROBBERIES INVOLVE THREE TO FIVE BLACK MALES WEARING SKI MASKS, BOTH KNIT AND STOCKING TYPE. THE SUBJECTS ARE * * ARMED AND DANGEROUS * * THERE [SIC] ARE ARMED WITH HANDGUNS AND AT LEAST ONE SHOTGUN. THEY HAVE PISTOL WHIPPED PATRONS IN TWO OF THE ROBBERIES. THE SUBJECTS GO IN WITH AT LEAST THREE SUBJECTS AND ROB. THE CLERK, PATRONS AND STAFF.
The bulletin described different circumstances of the three robberies that had occurred on November 15, 16, and 17, 1996. In the November 15 robbery, three armed African-American males, two with handguns and one with a sawed off shotgun, robbed a restaurant and fled on foot. In the November 16 robbery, three African-American males fled to a "small red colored vehicle Nissan/Toyota type." One of the victims in the November 16 robbery had found some of their personal belongings *1148 in the "area of I-95 and Cypress Creek Rd." The description of the November 17 robbery stated that five African-American males had fled to an "early 1980's brown Oldsmobile, dark tinted windows and a temporary tag."
Officer Thomas Way was familiar with the bulletin, because he had seen it at 5:00 p.m. on November 19. That night he was on road patrol at about 9:35 p.m. when he heard over the police radio that there had been a robbery at Wings `n Things restaurant in Pompano Beach. The radio transmission contained no further details about the Wings `n Things robbery.
At about 10:00 p.m., Officer Way spotted appellants' vehicle a block from Wings `n Things going southbound on Cypress Creek Road. He could tell that the vehicle contained more than two occupants and that it had tinted windows. About three or four blocks before the stop, the officer determined that at least three of the occupants of the car were African-American. Appellants committed no traffic violation. Neither the car nor the occupants engaged in any activity which suggested involvement in a recent robbery. Officer Way stopped the car as a "felony high risk stop," based on the description of the car being similar to that involved in the November 16 robbery, the fact that it contained multiple African-Americans, and its proximity to the Wings `n Things robbery.
The issue of whether Officer Way had a founded or reasonable suspicion to effect the stop is reviewed de novo by this court. See Melendez v. Sheriff of Palm Beach County, 743 So.2d 1145 (Fla. 4th DCA 1999) ("Determinations of probable cause and reasonable suspicion are entitled to a de novo review on appeal.") (citing Ornelas v. United States, 517 U.S. 690, 691, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996), and Saturnino-Boudet v. State, 682 So.2d 188, 192 n. 6 (Fla. 3d DCA 1996)); C.G. v. State, 689 So.2d 1246, 1248 (Fla. 4th DCA 1997); DeLeon v. State, 700 So.2d 718, 719 (Fla. 2d DCA 1997) ("A trial court's determination of reasonable suspicion to conduct an investigatory stop or detention is subject to de novo review.") (citing Ornelas and Saturnino-Boudet).
The facts in this case gave rise to only a hunch or "bare" suspicion which was insufficient to justify the stop. In Hunter v. State, 660 So.2d 244, 249 (Fla. 1995), the supreme court set forth the legal parameters for a traffic stop:
A law enforcement officer may stop a vehicle and request identification from its occupants when the officer has founded or reasonable suspicion that the occupants of the vehicle have committed, are committing, or are about to commit a crime. § 901.151(2), Fla. Stat. (1993). A "mere" or "bare" suspicion will not suffice.
A "founded suspicion" is a suspicion which has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge.
(Case citations and footnote omitted).
The bulletin demonstrated no recurring pattern in the getaways from the Chinese restaurant robberies. In one case, the robbers fled on foot. In another, they fled in a brown Oldsmobile. The bulletin broadly described the vehicle involved in the November 16 robbery as a "small red colored vehicle Nissan/Toyota type" a generic description that included countless automobiles. Finally, the bulletin indicated that only men had been involved in the previous robberies.
The radio transmission concerning the Wings `n Things robbery was also devoid of detail. There was no information in the BOLO to suggest that the robbery was in any way connected to the Chinese restaurant robberies. The officer had no information about how the robbery had been committed. The officer had no information about the perpetrators of that robbery or how they left the scene. Nothing appellants did while the officer observed them suggested any involvement in a recent robbery. There was no evidence of flight *1149 from the police, speeding, or other evasive, suspicious conduct. Appellants were stopped after pulling onto the grounds of a hospital.
It is the lack of specificity in the information contained in the BOLO and the bulletin that distinguishes this case from those cases involving a radio transmission which contributed to a founded suspicion sufficient to justify a stop. For example, in Hunter, a BOLO informed Deputy Graves that a gray 4 door vehicle with three armed African-American males and two armed African-American females was at the scene of three armed robberies; all subjects appeared to be in their teens or twenties. The officer received the BOLO 20 minutes after the first robbery and 10 minutes after the third robbery. He was also informed that a robbery victim described both the driver and a front-seat passenger as African-American females. Shortly thereafter, Deputy Graves stopped the defendant's vehicle, driven by an African-American female, because it matched the description in the BOLO. The supreme court found:
no error in the trial court's conclusion that Deputy Graves had a founded suspicion to stop the vehicle. The length of time and distance from the robbery, the source of the BOLO, the time, and particularly, the specificity of the description of the vehicle's occupants, all support the stop. There is also no evidence that the officer made the stop for any reason other than responding to the BOLO.
Hunter, 660 So.2d at 249; see also Berkowitz v. State, 737 So.2d 1179 (Fla. 2d DCA 1999); State v. Vance, 692 So.2d 270 (Fla. 5th DCA 1997).
We reverse the final summary judgment entered in favor of appellee and remand to the trial court with directions that appellants' motion for summary judgment be granted as to the issue of the legal justification for the detention of appellants.
STEVENSON, GROSS, JJ., and BAILEY, JENNIFER D., Associate Judge, concur.