DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KEVIN LAMONT SAMMIEL,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3310

[July 12, 2017]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Karen M. Miller, Judge; L.T. Case No. 12CF009385AMB.

Carey Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Georgina Jimenez-Orosa, Senior Assistant Attorney General, West Palm Beach, for appellee.

DAMOORGIAN, J.

Kevin Sammiel appeals his conviction and sentence for one count of first degree murder and one count of armed robbery. Appellant raises twelve issues on appeal.[1] Finding merit in none, we affirm but write to address the court's suppression ruling.

---

[1] Appellant argues that the court erred by: 1) denying his motion for judgment of acquittal on both counts, 2) denying his request to amend the standard jury instruction on principals, 3) excluding testimony regarding gunshot residue testing, 4) finding that the State proffered a genuine, race neutral reason for striking two venire members, 5) denying Appellant's motion to suppress the traffic stop, 6) admitting a portion of Appellant's recorded statement wherein the interrogating officer stated that she already knew what happened, 7) redacting a portion of Appellant's statement, 8) overruling Appellant's objections to the State's opening and closing comments regarding the DNA evidence, 9) overruling several other objections to the State's closing, 10) admitting certain cell-phone records, 11) failing to conduct a *Richardson* hearing based on the State identifying a records custodian as a "Class C" witness, and 12) allowing the State to introduce a photograph of Appellant in handcuffs.

Appellant, along with two other men, Thomas Byrd and Sherman Colson, were charged with the robbery and murder of Dustin Deckard (the "Victim"). We set forth the following salient facts in our opinion on Byrd's appeal:

> The evidence established the Victim was shot and killed while walking to a friend's home shortly after 12:30 a.m. Surveillance video from a nearby house depicted the Victim walking by while talking on his cell-phone at 12:31 a.m. About a minute later, the tape caught a light colored mini-van slowly driving by. Shortly thereafter, a witness saw two men struggling with the Victim, and noticed a "beat-up" "grayish-green" minivan idling nearby. At first, the witness assumed that the van was stopping to call the police, but then saw the two men run towards the van, get in the passenger-sliding door, and watched the van speed away in a northbound direction. The witness called 911 at 12:38 a.m. and the police immediately put out a BOLO for the van. Around the same time, another witness called the police anonymously and reported that there was a dead body lying on the sidewalk.

> The first officer to respond to the BOLO reported seeing what appeared to be a gold colored minivan with damage on the driver's side about three blocks north-east of the shooting at 12:40 a.m. At 12:48, an officer a few miles north spotted a van matching the BOLO description. That officer pursued the van and, as soon as he turned on his overhead lights, a passenger (who turned out to be [Byrd]) jumped out of the van. The driver (Colson) pulled over and police arrested him and the remaining passenger, Sammiel. [Byrd] was quickly apprehended with the assistance of a K9 unit. Law enforcement recovered the Victim's cell-phone from inside the van. The murder weapon was never found.

> Upon being arrested, [Byrd] refused to speak with the police. Colson, on the other hand, admitted to his role in the murder and identified [Byrd] as the shooter. Sammiel spoke with police, but denied any involvement in the robbery and shooting, claiming that an unspecified "they" came and picked him up from his aunt's house presumably after the shooting.

*Byrd v. State*, 2017 WL 2569782, at *1 (Fla. 4th DCA June 14, 2017).

2

Prior to trial, Appellant moved to suppress evidence of the cell-phone found in the van and Appellant's statement, arguing that the evidence was gathered as the result of an unlawful arrest. Specifically, Appellant argued that "law enforcement did not have reasonable articulable suspicion to justify stopping the van [because] the BOLO in this case was vague."

The court held a suppression hearing wherein the State presented audio of the two 911 calls as well as testimony from the eyewitness caller and the officers who were involved in the pursuit and stop of the van. At the hearing, the witness clarified that there was no traffic at the time she saw the incident. She also testified that the van was silver, older, and had tinted windows. The first officer to respond to the initial BOLO explained that it was difficult to tell the exact color of metallic cars under the street lights. He reiterated that the van he saw was either silver or gold, was older, had dark tint, some body damage, black door handles, and was heading in a northbound direction. The officer saw that there were multiple people inside the van. Based on all of the circumstances, he called in his sighting of the van and provided further descriptive details. The officer who effectuated the stop testified that when he encountered the van, there were no other cars on the road. Since the van matched the BOLO for a gold or silver van headed in a northbound direction from the crime scene, he pulled behind the van and effectuated the stop. The van in question was registered as a silver van.

Appellant submitted testimony from a private investigator who testified that he mapped three possible routes from the crime scene to where the van was ultimately stopped. The investigator explained that the route which crossed paths with the first officer to respond to the BOLO was the longest route, 5.2 miles as opposed to the shortest route of 4.6 miles. Appellant also introduced DMV records which established that there were over 6,000 silver vans registered in Palm Beach County during the relevant time period.

Considering the foregoing, the court denied Appellant's motion, ruling that:

> Based on the totality of the circumstances, including but not limited to, the source of the information for the BOLO, the information provided in the BOLO, the suspects' direction of travel, the late night hour, the lack of traffic on the road and the location of the offense in relation to the stop, [law enforcement] had a well-founded reasonable suspicion to justify the stop of the defendant's vehicle.

3

"A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Rolling v. State,* 695 So. 2d 278, 291 (Fla. 1997). "The appellate court will accept the trial court's factual findings if they are supported by competent substantial evidence." *Gaines v. State,* 155 So. 3d 1264, 1268 (Fla. 4th DCA 2015). "However, the trial court's application of the law to the historical facts is reviewed de novo." *Id.*

"To conduct an investigatory stop, a police officer must have 'a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.'" *Id.* (quoting *Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993)). In this case, the van in which Appellant was riding was stopped based on a BOLO. "[T]he assessment of reasonable suspicion in the context of a BOLO is a fact-specific inquiry." *State v. Jemison,* 171 So. 3d 808, 812 (Fla. 4th DCA 2015).

"A BOLO providing a 'bare bones' description of a vehicle, without more, is insufficient to create the reasonable suspicion necessary for a traffic stop." *Id.*; *see also Walker v. City of Pompano Beach*, 763 So. 2d 1146, 1148–49 (Fla. 4th DCA 2000) (no reasonable suspicion to stop a vehicle based on a BOLO for a "'small red colored vehicle Nissan/Toyota type'" where there were no details regarding the crime, there was no information about the perpetrators or how they left the scene, and there was no evidence of flight from the police or other evasive conduct). "By contrast, even where a BOLO does not provide significant details, reasonable suspicion can arise if a vehicle matches the BOLO description and there are additional supporting factors." *Jemison*, 171 So. 3d at 812. "The following factors are relevant in assessing whether a vehicle stop pursuant to a BOLO was supported by a founded suspicion: '(1) the length of time and distance from the offense; (2)[the] route of flight; (3) [the] specificity of the description of the vehicle and its occupants; and (4) the source of the BOLO information.'" *Id.* at 811 (quoting *Hunter v. State,* 660 So. 2d 244, 249 (Fla. 1995)).

In *Jemison,* we held that under the totality of the circumstances, an officer had reasonable suspicion to stop a vehicle based on a relatively generic BOLO for a "white Tacoma pick-up truck, newer model, with dark tinted windows" because there were additional supporting factors. *Id.* at 812–13. Namely, the officer saw a vehicle matching the description along the only route available within six minutes of the BOLO being issued at a time of day when traffic was very light. *Id.* at 812. Additionally, the BOLO came from a reliable source: the victim; and the driver was acting

4

suspicious. *Id.*; *see also Monfiston v. State*, 924 So. 2d 61, 63 (Fla. 4th DCA 2006) (finding reasonable suspicion to stop the vehicle where, although the BOLO did not provide significant details, it matched the description of the vehicle stopped—a dark-colored Ford Expedition—, the vehicle was traveling in the direction indicated by the BOLO, the vehicle traveled for a distance without its lights on, and the vehicle immediately changed directions after the driver observed the officer); *State v. Wong*, 990 So. 2d 1154, 1155–56 (Fla. 3d DCA 2008) (BOLO identifying a silver or gray BMW driven by a Hispanic male provided reasonable suspicion—even though the BOLO did not include a direction of travel taken by the vehicle—where a vehicle matching the BOLO description was 2.5 to 3 miles away from the scene of the crime and was at a location that the officer believed was the most likely exit to be used by the perpetrators); *State v. Gelin*, 844 So. 2d 659, 660–62 (Fla. 3d DCA 2003) (BOLO, which described a white van with two black males but provided no direction of travel and no further description of the occupants, gave the police reasonable suspicion to conduct a stop where detective went to the location he believed the individuals would go to leave the area of the robbery).

Here, although the physical description of the van given by the eyewitness in the 911 call was relatively bare-bones ("grayish-greenish beat up van"), there were four additional factors which created reasonable suspicion to stop the van. First, the BOLO came from a reliable source: a citizen eyewitness who had no interest in the situation and who was fully cooperative with law enforcement. Second, there were virtually no other cars on the road at the time the BOLO went out. Third, the witness told law enforcement that there were at least three people in the vehicle and was able to identify the vehicle's direction of travel. Fourth, law enforcement stopped the vehicle within 10 minutes of the BOLO and less than 5 miles away from where it was initially spotted. Under the totality of these circumstances, law enforcement had a reasonable suspicion to conduct the stop. *Jemison*, 171 So. 3d at 813. Accordingly, we hold that the court did not abuse its discretion in denying Appellant's motion to suppress. Finding no other errors, we affirm Appellant's conviction and sentence.

*Affirmed.*

CIKLIN and LEVINE, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

5